IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83929-2-I |
| Respondent, | |
| v. | DIVISION ONE |
| TIEN LAM, | UNPUBLISHED OPINION |
| Appellant. | |

HAZELRIGG, A.C.J. — Tien Lam was charged with two counts of possession of a controlled substance with intent to manufacture or deliver (PWI) arising from separate incidents, and one count of possession of drug paraphernalia, a misdemeanor. Lam argues he was unlawfully seized and the court erred in denying his motion to suppress evidence obtained as a result of that seizure. He further avers the trial court erred in denying his motion to sever the two counts of PWI, only one of which resulted in conviction at trial, and raises claims of prosecutorial misconduct in closing argument. He also challenges the sufficiency of the evidence as to the conviction for possession of drug paraphernalia. Because the record evinces no error, we affirm.

FACTS

On November 29, 2021, Snohomish County Sheriff's Office (SCSO) Deputy Jason Harris arrested Tien Lam, a Vietnamese man,[1] for possession of drug

---

[1] In the trial court, Lam self-identified as "Vietnamese," thus, we adopt his language for purposes of our analysis herein.

paraphernalia (PDP) under the Snohomish County Code (SCC) and searched him incident to arrest which resulted in the discovery of additional evidence of drug crimes. On December 21, 2021, Harris arrested Lam again after he arranged a controlled drug purchase over the phone and Lam appeared at the agreed upon meeting place. The State ultimately charged Lam with two counts of possession of a controlled substance with intent to manufacture or deliver (PWI), one each from the November and December arrests, and one count of PDP, a simple misdemeanor, resulting from the November arrest.[2]

Prior to trial, Lam moved to sever the two PWI counts under CrR 4.4 and argued that their joinder would result in prejudice. He also filed a CrR 3.6 motion to suppress evidence that was obtained as a result of the initial contact with law enforcement in November on the basis that he was unlawfully seized, arrested, and searched in violation of article I, section 7 of the state constitution and the Fourth Amendment to the United States Constitution. The State opposed both motions. After an evidentiary hearing where the court heard testimony from Harris and argument from the parties, the trial court denied both of Lam's motions. Lam renewed his motion to sever once before trial in his motions in limine and again at the conclusion of the State's case in chief. The trial court denied each renewal of the motion.

The case proceeded to trial, after which the jury found Lam guilty of one count of PWI based on the December incident and PDP based on the November incident. The jury acquitted Lam of the PWI charge from the November arrest.

---

[2] The misdemeanor was added as count 3 in an amended information filed approximately one month after Lam was originally charged with the two counts of PWI.

Following the verdict, Lam filed a motion for arrest of judgment and to dismiss count 3 (PDP) "based upon insufficient evidence" and a separate motion for a new trial on both the crimes of conviction due to prosecutorial misconduct. These motions were denied by the trial court which entered findings of fact and conclusions of law on both rulings.

Lam timely appealed.

## ANALYSIS

I.    Motion To Suppress Under CrR 3.6

Lam assigns error to the denial of his motion to suppress evidence obtained pursuant to his arrest on November 29, 2021. According to Lam, the officers unlawfully seized him moments before the arrest when they approached the vehicle in which he was a passenger. In other words, Lam contends that he was unlawfully seized by officers prior to having any contact or interaction with those officers. Harris testified at the CrR 3.6 hearing that he observed Lam approach a parked vehicle, receive what appeared to be cash from the driver, and enter the rear passenger compartment before it drove to a nearby parking lot and that Harris approached the vehicle because of these observations. At oral argument before this court, when asked to clarify whether his position was that officers would need to have a reasonable articulable suspicion before even walking up to the car to look inside the back window, counsel for Lam responded, "Absolutely."[3]

---

[3] Wash. Ct. of Appeals oral argument, *State v. Tien Lam*, No. 83929-2-I (Sept. 28, 2023), at 7 min., 38 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023091225/?eventID=2023091225.

"It is well settled that article I, section 7 of the Washington Constitution provides greater protection to individual privacy rights than the Fourth Amendment." *State v. Jones*, 146 Wn.2d 328, 332, 45 P.3d 1062 (2002). "Article I, section 7 is a jealous protector of privacy" and it provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." *State v. Valdez*, 167 Wn.2d 761, 777, 224 P.3d 751 (2009). "This provision protects 'those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant.'" *State v. Rankin*, 151 Wn.2d 689, 694-95, 92 P.3d 202 (2004) (quoting *State v. Myrick*, 102 Wn.2d 506, 511, 688 P.2d 151 (1984)). Thus, the State must obtain "a warrant for arrests, searches and seizures subject only to a few, limited exceptions." *Myrick*, 102 Wn.2d at 510. When an individual moves to suppress evidence based on a police encounter, "we must first determine whether a warrantless search or seizure has taken place and, if it has, whether the action was justified by an exception to the warrant requirement." *Rankin*, 151 Wn.2d at 695.

A.     Lam's Seizure by Law Enforcement

Our jurisprudence has long recognized that "'[n]ot every encounter between an officer and an individual amounts to a seizure.'" *State v. Armenta*, 134 Wn.2d 1, 10, 948 P.2d 1280 (1997) (quoting *State v. Aranguren*, 42 Wn. App. 452, 455, 711 P.2d 1096 (1985)). Under article I, section 7, a seizure occurs "'only when, by means of physical force or a show of authority, [a person's] freedom of movement is restrained. . . . There is a 'seizure' when, in view of all the circumstances surrounding the incident, a reasonable person would have believed that [they

- 4 -

were] not free to leave.'" *State v. Young*, 135 Wn.2d 498, 509-10, 957 P.2d 681 (1998) (quoting *State v. Stroud*, 30 Wn. App. 392, 394-95, 634 P.2d 316 (1981)). While the race and ethnicity of an individual are among the "many relevant circumstances that must be considered," they are "certainly not dispositive." *State v. Sum*, 199 Wn.2d 627, 638, 654, 511 P.3d 92 (2022).[4] Rather, the test "is a purely objective one, looking to the actions of the law enforcement officer." *Young*, 135 Wn.2d at 501. In *Sum*, our Supreme Court recently clarified one aspect of the seizure inquiry as follows:

> For purposes of this analysis, an objective observer is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in disproportionate police contacts, investigative seizures, and uses of force against Black, Indigenous, and other People of Color (BIPOC) in Washington.

199 Wn.2d at 631.

Whether an individual has been seized is a mixed question of law and fact. *Armenta*, 134 Wn.2d at 9. "'The resolution by a trial court of differing accounts of the circumstances surrounding the encounter are factual findings entitled to great deference,' but 'the ultimate determination of whether those facts constitute a seizure is one of law and is reviewed de novo.'" *Id.* (quoting *State v. Thorn*, 129

---

[4] In *Sum*, our Supreme Court noted that it has "never held that the race and ethnicity of the allegedly seized person are not relevant circumstances" in the seizure analysis. 199 Wn.2d at 637. Moreover, as the court pointed out, "when considering analogous issues relating to police encounters, the United States Supreme Court has held that objective demographic factors, such as a defendant's race and age, are relevant considerations." *Id.* at 641-42 (citing *United States v. Mendenhall*, 446 U.S. 544, 558, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)). *See also United States v. Washington*, 490 F.3d 765, 773 (9th Cir. 2007) (applying test for seizure under Fourth Amendment and considering defendant's race among the totality of the circumstances by noting "the publicized shootings by white Portland police officers of African Americans").

Thus, while our Supreme Court had not expressly acknowledged the logical deduction that race and ethnicity are circumstances to be factored in when reviewing the totality of the circumstances under the seizure analysis prior to *Sum*, these are not new considerations.

Wn.2d 347, 351, 917 P.2d 108 (1996), *overruled on other grounds by State v. O'Neill*, 148 Wn.2d 564, 62 P.3d 489 (2003)). "The rule in Washington is that challenged findings entered after a suppression hearing that are supported by substantial evidence are binding, and, where the findings are unchallenged, they are verities on appeal." *O'Neill*, 148 Wn.2d at 571. The person alleging unlawful seizure has the burden of proving they were seized. *Id.* at 574.

We first address Lam's contention that the trial court relied on two "improper factors" in its seizure analysis, his presence in a high crime area and Harris' knowledge of Lam's criminal history. Lam claims that courts cannot consider those factors when determining whether a seizure has occurred. His argument is unpersuasive and contradicted by controlling case law.

As our Supreme Court has explained, "A history of the same or similar crimes may be helpful in determining probable cause, but without other evidence, it also falls short of probable cause to search." *State v. Neth*, 165 Wn.2d 177, 185-86, 196 P.3d 658 (2008). Even when the officer is aware of criminal activity from years prior, committed or suspected, that information is still relevant to this analysis. *See State v. Hobart*, 94 Wn.2d 437, 446, 617 P.2d 429 (1980). The court has also clearly noted that the location of the alleged seizure is another circumstance to be considered; "information such as being in a high drug crime area" is a relevant consideration for probable cause. *Neth*, 165 Wn.2d at 185 n.3. Again, we consider "*all the circumstances*" when determining whether a seizure has occurred. *Rankin*, 151 Wn.2d at 695 (emphasis added); *see also Sum*, 199 Wn.2d at 648 ("*[T]here is a need to reiterate that the seizure inquiry depends on*

*the totality of the circumstances*." (emphasis added)).  We decline Lam's invitation

to arbitrarily redefine the "totality of the circumstances."

After the suppression hearing, the trial court entered its order on the CrR

3.5 and 3.6 motions and defense motion to sever in which it set out the facts that

were uncontested by the parties as well as the facts it resolved and conclusions of

law with respect to each motion.  The following were identified as undisputed facts

regarding the November incident, none of which are challenged on appeal:

> On November 29, 2021, just before noon, Deputy Harris was on patrol . . . at the intersection of Highway 99 and Airport Road when he observed [Lam] walking in the parking lot at Home Depot. Deputy Harris observed [Lam] approach a blue BMW passenger car and engage the driver in a conversation. Using binoculars, Deputy Harris observed the driver of the vehicle hand [Lam] what appeared to be cash which [Lam] immediately put into his bag. [Lam] got into the rear driver side seat of the vehicle which then drove a little distance away and parked in a stall in the Wendy's parking lot.
> Deputy Harris informed Sergeant Koster, who was also on patrol in a separate vehicle at that location, that he believed he had just witnessed a hand to hand drug transaction. The deputies decided to contact the parked BMW. Deputy Harris drove up to the BMW and parked his vehicle about a car width back from the BMW. Sgt. Koster approached the vehicle from a different direction and parked his vehicle within 6 to 8 feet from the front of the BMW. The deputies did not have their emergency lights activated and their vehicles did not block the exit path of the BMW which could have driven away by moving forward or backward in reverse.
> Deputy Harris walked up to the driver side rear passenger compartment of the BMW and through the window observed [Lam] in the rear passenger compartment with a satchel in his lap. In the open satchel, Deputy Harris observed a crumpled-up tin foil with burn marks on it. From his training and experience, Deputy Harris knows that tinfoil is commonly used to ingest M-30 pills.[5] Deputy Harris was aware that the user would place the pill on top of the foil and apply a lighter below the foil. As the pill gets heated through the foil, it releases narcotic fumes which the user then ingests using a straw

---

[5] "M-30 pills" were originally oxycodone 30mg tablets, but counterfeit pills were subsequently developed with varying amounts of fentanyl.  *See Drug Fact Sheet,* DRUG ENFORCEMENT ADMIN. (2021), https://www.dea.gov/sites/default/files/2021-05/Counterfeit% 20Pills%20fact%20SHEET-5-13-21-FINAL.pdf.

like object or pipe called a tooter. The melting pill leaves a residue referred to as "snail trails" on the inside of the foil while the outside of the foil has burn marks from the torch lighter being applied to the foil. Deputy Harris was aware that a crumpled or folded tin foil with burn marks was indicative of recent drug use or future drug use.

Deputy Harris placed [Lam] under arrest for possession of drug paraphernalia. A search of [Lam]'s bag which he had on him incident to arrest revealed the crumpled piece of tin foil (which had part of an M-30 pill on it,) methamphetamine, and thousands of dollars in small cash bills, which from the deputy's training and experience was consistent with drug dealing.

Relying on the objective observer standard articulated in *Sum*, Lam insists that he "was seized when the police approached the BMW and before the police saw the foil in his satchel." According to Lam, "At no point after the police started approaching the BMW would an objective observer believe Lam could leave." This is so, Lam contends, because he is a person of color who was known to Harris and "[a] person of color, known to the police does not walk away." While we agree that Lam's race and ethnicity are relevant considerations, they are by no means the only ones that we consider. *Sum*, 199 Wn.2d at 654.

Here, the undisputed facts establish that Harris and Koster drove to the Wendy's parking lot and parked their vehicles without either activating their emergency lights or blocking the BMW's exit. Moreover, there was no interaction, verbal or physical, between the officers and Lam until Harris saw the crumpled-up foil with burn marks on it through the vehicle window, ordered the occupants out of the BMW, and placed Lam under arrest pursuant to the county code. Under article I, section 7, a seizure requires that "law enforcement's display of authority or use of physical force" causes a person to believe they are not free to leave, *Sum*, 199 Wn.2d at 653, and though the degree of authority or force required may

fluctuate depending on the totality of the circumstances, the mere approach of the officers in this situation falls plainly short of an unlawful seizure. Perhaps more critically, the record does not establish that Lam was even aware of approaching officers until the moment he was observed with the drug paraphernalia and placed under arrest. On appeal, Lam does not engage with this additional aspect of the seizure analysis or otherwise demonstrate how he could have been seized at the moment of the officers' approach to the BMW if he was not, in fact, aware of their presence. Accordingly, the trial court did not err in finding that Lam was not seized until Harris observed the drug paraphernalia in the satchel in Lam's lap through the vehicle window and placed him under arrest.

B.     Findings on Probable Cause To Arrest Lam

Lam next challenges multiple findings underlying the trial court's conclusion that Harris had probable cause to arrest him for suspicion of PDP under the Snohomish County Code. After determining that Lam was not seized at the point the officers approached the BMW, the trial court entered the following findings as establishing probable cause for Lam's arrest:

> On November 29, 2021, Deputy Harris observed what he recognized as a hand-to-hand drug deal between [Lam] and the driver of the BMW. He then observed [Lam] get into the vehicle which drove a short distance away and parked in a parking lot in an area known for its high drug use and drug dealing. From prior contacts with [Lam], the deputy was aware [Lam] sold and used drugs. Deputy Harris observed the crumpled tin foil with burn marks in the satchel of [Lam] while he was sitting in the rear of the parked BMW with other occupants. Deputy Harris was aware, based on his training and experience, that tin foil is commonly used by individuals to ingest drugs. He also knew that the process which involves the application of a lighter to the foil to melt the narcotic, leaves burn marks on the outside of the foil. When Deputy Harris observed the crumpled foil

- 9 -

with burn marks in [Lam]'s satchel, he had probable cause to believe that [Lam] was in possession of drug paraphernalia and that the crumpled tin foil with burn marks was indicative of recent drug use or that the tin foil was possessed by [Lam] with the intent to use it for ingesting drugs. Possession of drug paraphernalia with intent to use it is a misdemeanor under SCC 10.48.020.

Lam challenges the trial court's findings that Harris witnessed a "hand-to-hand" drug deal and that the piece of foil Harris saw in Lam's bag provided a basis for seizure. Challenged findings are binding if supported by substantial evidence, which exists if the evidence is "sufficient to persuade a fair-minded, rational person of the finding's truth." *O'Neill*, 148 Wn.2d at 571; *State v. Stewart*, 12 Wn. App. 2d 236, 240, 457 P.3d 1213 (2020).

At the suppression hearing, Harris testified to his training and experience with narcotics investigations, familiarity and previous contacts with Lam, and the events surrounding the arrest on November 29. Based on Harris' experience, drugs are normally paid for in cash because "narcotics dealers usually don't have access to things like credit card machines and an actual business front for things like that. Usually it's hand-to-hand sales, especially to low-level users. It's going to be cash." At the time of his testimony, Harris stated that he had conducted "dozens" of narcotics investigations and was a member of the "Directed Patrol Unit" within the SCSO, "a police unit that focuses on high crime areas." According to Harris, one of the high crime areas where he has been specifically directed to patrol is Highway 99 and Airport Road. Harris stated that drug use is "rampant" in that location and he confirmed that he had observed drug deals occur and watched people openly using drugs there.

Prior to November 2021, Harris had contacts with Lam. He testified that "[o]ne time I saw him on a traffic stop when he was arrested. And then maybe a couple of other times I have talked to other deputies about him or seen him at Airport and Highway." Harris was aware that Lam had been previously convicted of drug charges and recalled that, on February 17, 2021, he contacted Lam who ultimately provided the following written statement: "'My name is Tien Lam. I sell and use drugs.'"

Harris then testified with regard to the contact that occurred on November 29, 2021. He explained that he was working and stationed at the intersection of Highway 99 and Airport Road. That afternoon, Harris recognized Lam walking in the parking lot of Home Depot, and observed the following interaction:

> I saw a blue BMW passenger car pull into the parking lot. Parked. I saw [Lam] walk up to the car. It seemed like they conversed for a moment back and forth. The white male driver of the car handed [Lam] what appeared to be cash. He quickly put it in his little satchel, side bag, and then got in the rear passenger—or the rear driver's side of the car.

After Lam entered the BMW, Harris stated that the "BMW drove towards Home Depot, kind of looped back around, and then parked just south of Wendy's. Harris then drove to the area where the BMW was parked, but testified that he neither pulled the BMW over nor caused it to stop as it "was stopped before [he] got there." Harris explained that Koster, who was in a separate vehicle, also parked in the area, but they neither turned on their emergency lights nor blocked the BMW in any way.

Harris then got out of his vehicle and approached the driver's side rear passenger door of the BMW and looked into the window. At this point, he saw

- 11 -

Lam sitting in the BMW "with his satchel on his lap" and "observed that [Lam's] satchel was open, horizontal zip, and [Harris] observed crumpled[-]up foil with a burn mark on it." According to Harris, based on his training and experience, tinfoil is oftentimes used "to ingest M-30s," which he clarified are pills that contain fentanyl. He further explained that the burn marks often arise as follows:

> The user employs a torch-style lighter below the foil, which is flat. They then put the pill on top of the foil. And while they are doing that, they also employ what is referred to as a "tooter," which is a usually—it's a makeshift pipe, which is usually made out of a straw or a broken pen or some other cylindrical long device. And when the pill is super-heated on the foil, it releases narcotic fumes. And that creates the burn marks as the pill slides along the foil.

Harris confirmed that the foil with burn marks that he saw in Lam's bag was consistent with such usage. Harris also explained that

> most of the time with narcotics when they are done with or have just smoked from that, they will either crumple it up or fold it up to save it for later. And because of the process of smoking the narcotics off of it, that is when you get the—some people refer to it as "snail trails" of the pill going along, along the foil. That would be on the inside. On the outside of the foil there would be burn marks from the torch-style lighter going back and forth on it.

Accordingly, Harris "decided to place him under arrest for possession of drug paraphernalia."

Sufficient evidence supports the finding that "Harris observed what he recognized as a hand-to-hand drug deal between [Lam] and the driver of the BMW." Harris had experience with narcotics investigations and was aware that cash is normally used for drug transactions. He was also familiar with Lam who had previously provided a statement, that said, "I sell and use drugs." Moreover, the incident occurred in an area known for "rampant" drug activity which was a

point of focus for the SCSO Directed Patrol Unit, and Harris directly observed Lam getting into the BMW and the driver handing Lam "what appeared to be cash" before the car drove to Wendy's and parked. Harris testified that he observed or recognized conduct he believed, based on his training and experience, to be consistent with a hand-to-hand drug transaction. The court's finding is supported by substantial evidence.[6]

Lam also assigns error to the trial court's finding which he characterizes as conveying the idea "that seeing a crumpled piece of foil in [] Lam's satchel provided an additional basis to seize him." Contrary to Lam's framing, this item was not found to be an "additional basis" to seize him; as the trial court's findings make clear, it was not until Harris saw Lam in possession of a crumpled up piece of foil with burn marks that probable cause existed to arrest Lam. To the extent that Lam challenges whether this finding amounted to probable cause for his arrest, this court reviews that issue de novo. *State v. Grande*, 164 Wn.2d 135, 140, 187 P.3d 248 (2008).

For this warrantless arrest to be deemed lawful, the State was required to establish probable cause that a crime had been or was being committed. *Id.* at 141. "Probable cause exists where the facts and circumstances within the arresting officer's knowledge and of which the officer has reasonably trustworthy information are sufficient to warrant a person of reasonable caution in a belief that

---

[6] We note, however, that the phrasing of this finding could be read as resolving a question of fact for the jury; whether the conduct Harris observed was, in fact, a hand-to-hand drug transaction, which went directly to the PWI charge set out in count 1. While it is clear based on the subsequent proceedings that this was not the court's intention, great care should be taken in the phrasing of findings to avoid any such confusion.

an offense has been committed." *State v. Terrovona*, 105 Wn.2d 632, 643, 716 P.2d 295 (1986). To meet this burden, Harris was required to have a reasonable articulable suspicion that Lam was involved in criminal activity. *See Grande*, 164 Wn.2d at 141. As Harris' testimony shows, he did.

According to Lam, the crumpled tinfoil with burn marks on it did not constitute drug paraphernalia under SCC 10.48.020 because the "primary design function of foil is not for drug use." In the alternative, he contends that "[m]ere possession of drug paraphernalia is not a crime." We reject both arguments.

First, SCC 10.48.010 defines "drug paraphernalia" as follows:

> all equipment, products, and materials of any kind whose primary design function is for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling *or* otherwise introducing into the human body unlawful drugs, including but not limited to controlled substances as defined by chapter 69.50 RCW.

(Emphasis added.) The use of the disjunctive "or" in the plain language of the code establishes that "primary design function" as used in the definition of drug paraphernalia captures use in a variety of cultivation, creation, preparation, or storage activities, as well as "otherwise introducing into the human body unlawful drugs." Further, the listed examples of "drug paraphernalia" plainly show that the "primary design function" is not required to be for drug use; rather, the product must either be designed for drug use or *intended* for such use. *See* SCC 10.48.010(11). Among others, more specific examples of drug paraphernalia listed in the county code include spoons, blenders, bowls, containers, and balloons; all items whose manufacturer likely designed them for purposes far removed from the

preparation, storage, or ingestion of controlled substances, but the county expressly included nonetheless.

To determine whether an object constitutes drug paraphernalia, courts are explicitly directed to consider all "logically relevant factors." SCC 10.48.010. Noticeably absent from the description of the item in Lam's briefing, testimony from the trial court and photo exhibits introduced at trial establish that the foil Lam possessed was not only crumpled, but contained visible burn marks. Harris testified that his training and experience investigating drug crimes led him to conclude that the clearly visible burn marks on the foil in Lam's possession had resulted from use as drug paraphernalia, specifically for the consumption of drugs.[7] Accordingly, the piece of foil at issue falls within the broad definition of "drug paraphernalia" under the SCC.

Second, SCC 10.48.020 does not punish "mere possession." As this court has already recognized, SCC 10.48.020 "prohibits possession of drug paraphernalia *with intent to use*." *State v. Fisher*, 132 Wn. App. 26, 28, 130 P.3d 382 (2006) (emphasis added). Although possession alone is insufficient to support a criminal conviction under state law,[8] "evidence indicating the drug paraphernalia had been used to ingest or inhale a controlled substance will support probable cause for arrest." *State v. Neeley*, 113 Wn. App. 100, 108, 52 P.3d 539 (2002). As Harris explained in detail based upon his training and experience, the condition

---

[7] Harris also testified that upon unfolding the piece of foil after it was seized, he observed that it contained a partial blue pill with an "M" on one side and a "30" on the other. The subsequent search of the BMW resulted in the seizure of a plastic bag that contained 112 blue pills with similar markings that were sent to the state crime lab and tested positive for fentanyl.

[8] Throughout briefing, Lam conflates the case law concerning the state crime of unlawful use of drug paraphernalia under RCW 69.50.102 and the SCC under which Lam was actually arrested, charged, and convicted.

- 15 -

of the foil at issue here (crumpled shape and clearly visible burn marks) indicated that it had been used and was intended for drug use. This was confirmed by the discovery of the partial pill that was folded inside the foil and matched those which later tested positive for fentanyl.

II.     Motion To Sever Under CrR 4.4

Lam argues that the trial court erred in denying his motion to sever counts 1 and 3 (November 2021 PWI and PDP) from count 2 (December 2021 PWI). We disagree.

This court "review[s] the denial of a motion to sever for manifest abuse of discretion." *State v. Medina*, 112 Wn. App. 40, 52, 48 P.3d 1005 (2002). "A manifest abuse of discretion arises when 'the trial court's exercise of discretion is manifestly unreasonable or based upon untenable grounds or reasons.'" *State v. Lile*, 188 Wn.2d 766, 782, 398 P.3d 1052 (2017) (internal quotation marks omitted) (quoting *State v. Darden*, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002)). "Defendants seeking severance have the burden of demonstrating that a trial involving both counts would be so manifestly prejudicial as to outweigh the concern for judicial economy." *State v. Bythrow*, 114 Wn.2d 713, 718, 790 P.2d 154 (1990).

Under CrR 4.3, multiple offenses may be joined with each offense that constitutes a separate count when those offenses are either "of the same or similar character, even if not part of a single scheme or plan," or "based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan." CrR 4.3(a)(1), (2). Pursuant to CrR 4.4(b), trial courts "shall grant a severance of offenses whenever before trial or during trial with consent of

the defendant, the court determines that severance will promote a fair determination of the defendant's guilt or innocence of each offense."

"Prejudice may result from joinder if the defendant is embarrassed in the presentation of separate defenses, or if use of a single trial invites the jury to cumulate evidence to find guilt or infer a criminal disposition." *State v. Russell*, 125 Wn.2d 24, 62-63, 882 P.2d 747 (1994). To determine whether the potential for prejudice requires severance, the trial court must consider the following factors: "(1) the strength of the State's evidence on each count; (2) the clarity of defenses as to each count; (3) court instructions to the jury to consider each count separately; and (4) the admissibility of evidence of the other charges even if not joined for trial." *Id.* at 63.

In denying Lam's motion to sever, the trial court considered each factor in turn. First, it found the strength of the State's evidence on each count to be comparative. It noted that there were witnesses to both counts and civilian witnesses were expected to testify to the drug deal alleged in count 1. Second, the court determined that Lam could "maintain clear defenses to each count if the counts are tried together" because his defense to both was general denial. Third, it noted that the trial court would be able to instruct the jury using a standard jury instruction that "a verdict on one count should not control the verdict on the other count." Fourth, the court explained that the evidence on each count would be cross admissible in separate trials as either evidence of a common scheme or plan or pursuant to the "*res gestae* exception[9] to ER 404(b)."

---

[9] The *res gestae* exception to ER 404(b) allows the admission of "evidence of other crimes or misconduct where it is 'a link in the chain of an unbroken sequence of events surround the

Lam renewed this motion twice, once before trial and once at the close of the State's case, though each of these subsequent versions were slightly modified from the previous ones.[10]  When asked why Lam was renewing the motion before trial, Lam responded, "I guess it will depend whether these [civilian] witnesses appear or not, but the strength of evidence may change if they don't appear." Additionally, because the trial court had excluded the slip of paper with Lam's phone number and nickname on it that was found by Harris and that piece of evidence "was going to be used to establish the basis of contact in [c]ount 2," Lam contended that the factual posture had changed.  The State responded that the counts were still comparable, whether or not the civilian witnesses testified, and explained that it was relying on testimony from the officer to show that a phone number was found and that "he believed it was attributed to [Lam]."  The trial court upheld the prior ruling.

After the State's case in chief, Lam again renewed the motion to sever.  Lam challenged the comparability of counts 1 and 2 primarily on the basis that the strength of the State's evidence on both charges was no longer analogous. According to Lam, because the civilian witnesses associated with count 1 did not testify at trial and thus did not offer testimony "consistent with what they told police," "what happened in the car [was] a little bit murkier."  In denying the motion, the trial

charged offense . . . in order that a complete picture be depicted for the jury.'" *State v. Acosta*, 123 Wn. App. 424, 442, 98 P.3d 503 (2004) (internal quotation marks omitted) (quoting *State v. Brown*, 132 Wn.2d 529, 571, 940 P.2d 546 (1997)).

[10] In his initial pretrial motion, Lam sought to sever counts 1 (November PWI) and 2 (December PWI). The State subsequently filed an amended information, which added count 3 (November PDP).  Lam's renewed motion to sever set out in his trial memo and motions in limine expressly requested severance of counts 1 and 3 from count 2.  In his halftime motion, Lam sought reconsideration of the pretrial ruling on severance wherein the court appears to have focused on severance of only counts 1 and 2 from each other.

court did note that the lack of two civilian witnesses "may have weakened the State's case" but not "to the extent that these are not comparable." Overall, the court found "under all four factors that nothing much ha[d] changed."[11]

While acknowledging that the jury acquitted him of count 1, Lam nonetheless asserts that the jury likely considered his history of drug use when deciding to convict him on count 2. Even assuming arguendo that Lam could "point to specific prejudice" and assuming further that he could show the trial court's denial of his motion to sever was untenable, *see Bythrow*, 114 Wn.2d at 720, his argument would still fall short of supporting the relief he seeks. "Defendants seeking severance must not only establish that prejudicial effects of joinder have been produced, but they must also demonstrate that a joint trial would be so prejudicial as to outweigh concern for judicial economy." *Id.* at 722. "To establish error, [defendants] must also show that the prejudicial effect of trying all the counts together outweighed the benefits of joinder." *State v. Bluford*, 188 Wn.2d 298, 315, 393 P.3d 1219 (2017).

---

[11] Lam had separately moved to exclude a slip of paper with a name and phone number written on it that was found by Harris when he searched the vehicle involved in the November 29, 2021 arrest. Lam contended the document was inadmissible hearsay and, during the pretrial hearing, the State agreed. In light of the trial court's grant of Lam's motion in limine to exclude that piece of evidence, we note that the "*res gestae*" basis for cross admissibility of evidence set out in the trial court's initial severance analysis was largely undercut. This then calls into question the court's conclusion that "nothing much ha[d] changed" under the severance factors when ruling on the renewed defense motion at halftime.

Because the slip of paper was found by Harris in the car that Lam was in at the time of his arrest and Harris relied on the phone number on that paper to contact Lam and set up a controlled buy on December 21, its exclusion weighs heavily against admissibility under the *res gestae* exception. However, "[e]ven if separate counts would not be cross-admissible in separate proceedings, this does not as a matter of law state sufficient basis for the requisite showing by the defense that undue prejudice would result from a joint trial." *State v. Markle*, 118 Wn.2d 424, 439, 823 P.2d 1101 (1992). As Lam does not satisfy his burden under *Bythrow* of establishing manifest prejudice that outweighs the concern for judicial economy, his argument that the trial court erred in joining these offenses necessarily fails. 114 Wn.2d at 718.

In considering this challenge, it is noteworthy that the felony for which Lam was convicted was the one wherein Harris arranged for a controlled buy and not only spoke to the dealer, or at least a fixer, on the phone (Harris believed the person he spoke to was Lam), but also later encountered Lam in the location agreed upon for the transaction. In light of the strong evidence supporting this charge, any improper consideration of Lam's drug history by the jury is completely speculative. Critically, not only does Lam fail to engage in the abuse of discretion test, but he provides no argument in his opening brief nor in reply, as to the "obviously important considerations of economy and expedition in judicial administration." *Id.* at 311 (quoting *State v. Smith*, 74 Wn.2d 744, 755, 446 P.2d 571 (1968), *vacated in part on other grounds*, *Smith v. Washington*, 408 U.S. 934, 92 S. Ct. 2852, 33 L. Ed. 2d 747 (1972)). "'It is not the function of trial or appellate courts to do counsel's thinking and briefing,'" and we decline to do so here. *State v. Chapman*, 140 Wn.2d 436, 453, 998 P.2d 282 (2000) (quoting *Orwick v. City of Seattle*, 103 Wn.2d 249, 256, 692 P.2d 793 (1984)). As Lam does not engage with the manifest abuse of discretion standard and fails to carry his burden of showing how any prejudice would outweigh judicial economy here, he has not demonstrated that the trial court erred in its denial of his motions to sever.

III.     Prosecutorial Misconduct

Lam next seeks reversal based on the prosecutor's alleged misconduct in closing arguments, during which Lam says the prosecutor "denigrated his attorney," vouched for the State's witness, "worked to shift the burden of proof to the defense," and "mischaracterized the evidence."

To prevail on a claim of prosecutorial misconduct, the "burden rests on the defendant to show the prosecuting attorney's conduct was both improper and prejudicial." *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). "Any allegedly improper statements should be viewed within the context of the prosecutor's entire argument, the issues in the case, the evidence discussed in the argument, and the jury instructions." *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003). Prejudice depends on whether an objection was raised. When there is an objection below, "the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). However, when the defendant fails to object, the claim is waived "unless the remark is deemed so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." *State v. Stenson*, 132 Wn.2d 668, 726-27, 940 P.2d 1239 (1997). "If the prosecutor's misconduct is so flagrant that no instruction can cure it, a new trial is the mandatory remedy." *State v. Graham*, 59 Wn. App. 418, 426, 798 P.2d 314 (1990).

A.    Denigration of Defense Counsel

All of Lam's claims of prosecutorial misconduct arise from the deputy prosecutor's statements in closing arguments. At the end of Lam's closing, his counsel asserted:

> The prosecutor said Deputy Harris crossed all the T's and dotted all the I's. I beg to differ. You have one witness with uncorroborated testimony and no effort to corroborate it. No effort to record anything,

no effort to test items for DNA or fingerprints and prove what you're saying is true. It's the same deputy in the whole case. Just him.

In its rebuttal closing, the State responded:

Well, I suppose when there's nothing else, you call someone a liar. I suppose when there is nothing else to point to, you call someone a liar. That's what the defense has done. The defense wants you to believe that Deputy Harris is a liar. He's lying about all of this. He's lying about the interaction that he had in November. He's lying about the interaction he had in December. He's lying that that phone call [he] made even happened. But do you have anything in evidence to question the credibility of Deputy Harris? Is there any reason to question his credibility? Because he did something that you all did before you were seated as a jury, he swore an oath to tell the truth, to tell you exactly what happened. And he did just that. And there is absolutely zero evidence to the contrary. There is nothing in evidence to support the conclusion that he was lying to you.

While Lam does not directly acknowledge this in his opening brief, the record clearly establishes that his trial counsel did not object, so the higher standard applies to our review of this challenge. Lam argues that the prosecutor's comments constituted both denigration of defense counsel and improper vouching for Harris.

In *State v. Warren*, the prosecutor told the jury that there "were a number of mischaracterizations" in defense counsel's argument and described it as a "classic example of taking these facts and completely twisting them to their own benefit, and hoping that you are not smart enough to figure out what in fact they are doing." 165 Wn.2d 17, 29, 195 P.3d 940 (2008). The court found these statements to be improper because they commented on the role of defense counsel, but that they did not warrant reversal as Warren failed to object and did not meet the heightened standard. *Id.* at 29-30. Here, the prosecutor's statements also commented on defense counsel's role by stating "when there is nothing else to point to, you call

someone a liar," and the prosecutor repeatedly alleged that defense counsel was calling Harris a liar. While the defense pointed to a lack of corroboration of Harris' testimony and broadly attacked the investigation and the State's case at trial, both common and reasonable defense strategies, the prosecutor attributed words to defense counsel that were not actually spoken and clearly mischaracterized the defense argument. In criminal prosecutions, the attorney for the State "owes a duty to defendants to see that their rights to a constitutionally fair trial are not violated." *State v. Monday*, 171 Wn.2d 667, 676, 257 P.3d 551 (2011). While they may vigorously argue their case on behalf of the State, prosecutors must do so within this framework of protecting the rights of the accused. *Id.* The prosecutor's mischaracterization of Lam's critique of the State's case against him was misconduct. However, like Warren, Lam failed to object and thus the heightened standard of prejudice applies. Because Lam does not show that these comments were "so flagrant and ill-intentioned that no instruction could have cured them," he has failed to demonstrate entitlement to relief on this claim. *See Warren* 165 Wn.2d at 30.

      B.      Vouching for a Witness

According to Lam, the prosecutor improperly vouched for Harris by saying that defense counsel was calling him a liar (implying defense counsel was wrong in that regard and that Harris was truthful). "'It is improper for the prosecution to vouch for the credibility of a government witness. Vouching may occur in two ways: the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's

testimony.'"  *State v. Coleman*, 155 Wn. App. 951, 957, 231 P.3d 212 (2010) (quoting *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir. 1980)).  Prosecutors are "permitted a reasonable latitude in arguing inferences from the evidence, including references to a witness's credibility."  *Graham*, 59 Wn. App. at 429.  However, comments on the credibility of a witness can neither be expressed as a personal opinion nor be based on facts outside of the record.  *State v. Smith*, 104 Wn.2d 497, 510-11, 707 P.2d 1306 (1985).  Here, the prosecutor did not vouch for Harris.  Rather, the prosecutor made comments on defense counsel's role in arguing Lam's theory of the case and focused on Harris' testimony and facts within the record.  Thus, these statements did not constitute improper vouching.  Even if we determined otherwise, Lam has again failed to establish that these comments were so flagrant and ill-intentioned that a curative instruction would not have remedied any resulting prejudice.  This is particularly true as the "jury is presumed to follow the instruction that counsel's arguments are not evidence."  *Warren*, 165 Wn.2d at 29.

C.     Shifting Burden of Proof

Lam also contends the prosecutor committed misconduct when he "repeatedly attempted to shift the burden of proof to the defense."  Lam points to the following comments made by the prosecutor in rebuttal closing:

> Now let's talk about some of the other things. The defense wants you to believe that the driver of the BMW and the passenger of the BMW, well, they were drug dealers. They were drug dealers because they had a knife. They had other people's weapons—or they had a knife, they had other people's I.D.s, they had some foil, so they were the drug dealers. They could have easily just been the drug dealers just as easily as the defendant could have been. Why is that evidence

- 24 -

sufficient for you to come to the conclusion that the driver and the passenger are drug dealers, but the State's evidence proving that the defendant is a drug dealer isn't sufficient? It's just not. The defense wants to point you and say that there is no corroboration that any of this has happened. This is all someone's words to you, but there is corroboration.

The prosecutor proceeded to list the evidence from trial that he believed applied to each count. Lam raised no objection. After the prosecutor noted the evidence relevant to the various counts, he stated the following:

I don't think there's ever been anything in life that anybody is 100% sure of. There is always, there's always some kind of doubt or question or lingering suspicion or something. That's just the way life works. But the law doesn't require me, doesn't require the State to answer every single question. That's not the way it works. We only have to answer those three questions in the "to convict."
. . .
The State has shown you beyond a reasonable doubt evidence required to come to the conclusion of guilty on all three count[s]. And I'm asking you to come to that conclusion when you deliberate.

These comments were not improper. "Arguments by the prosecution that shift or misstate the State's burden to prove the defendant's guilt beyond a reasonable doubt constitute misconduct." *State v. Lindsay*, 180 Wn.2d 423, 434, 326 P.3d 125 (2014). "A prosecutor may commit misconduct if [they] mention[] in closing argument that the defense did not present witnesses or explain the factual basis of the charges, or if [they] state[] that the jury should find the defendant guilty simply because [the defendant] did not present evidence to support [their] defense theory." *State v. Jackson*, 150 Wn. App. 877, 885, 209 P.3d 553 (2009). Here, the prosecutor neither shifted nor misstated the State's burden of proof. Although he asked whether sufficient evidence could lead the jury to believe Lam's story that "the driver and the passenger are drug dealers," the prosecutor did not tell the

jury that it should find Lam guilty "simply because he did not present evidence to support his defense theory." *See Id.* Moreover, the prosecutor's comments focused on the evidence he believed supported the State's theory of the case and concluded by asserting the State had established beyond a reasonable doubt that Lam was guilty of all counts. Once again, even if we agreed with Lam's characterization of the State's argument in this regard, he has failed to demonstrate that the identified comments rose to the heightened level required to establish prejudice when the defendant fails to object. Accordingly, he does not prevail on this claim.

D. Mischaracterization of the Evidence

Lam's final argument as to prosecutorial misconduct is that the State mischaracterized the record. Lam avers this was particularly prejudicial as the alleged misconduct occurred during the State's rebuttal so defense counsel was unable to respond to it. However, the record establishes that defense reacted to the misstatement by raising an objection and, in response, the court corrected the State:

> [PROSECUTOR:] Let's talk about the Suboxone[12] that the defense indicated the defendant was in possession of. That was never tested. We have no idea if it was actually Suboxone. But if he was, he was carrying ten boxes of it. Ten boxes of Suboxone. When is the last time that you have been prescribed anything and you carried ten boxes of it with you?
>
> [DEFENSE]: Your Honor, I'm going to object to facts not in evidence.
>
> THE COURT: Mr. [prosecutor], I don't think there were boxes. In my recollection, looking at the pictures, they are packages.

---

[12] A brand name prescription drug used to treat people experiencing opiate addiction.

[PROSECUTOR]: Ten packages.

THE COURT: Please continue.

[PROSECUTOR]: *Ten packages. Excuse me*.

(Emphasis added.) Lam asserts that this was misconduct because the prosecutor relied on evidence outside of the record and "displayed an insensitivity" to Lam's poverty. His argument fails.

Even if we were to agree that referencing "boxes" rather than "packages" was improper in light of the prosecutor's entire argument, Lam does not show prejudice. Here, Lam must show that the prosecutor's "boxes" comment, which was contemporaneously corrected by the court, resulted in "a substantial likelihood of affecting the jury's verdict." *Emery*, 174 Wn.2d at 760. This he cannot do and, more critically, he does not even attempt to meet this standard in briefing. Whether insensitive or mistaken, these comments do not constitute misconduct.

IV.     Sufficiency of the Evidence for Possession of Drug Paraphernalia

Lam contends that the State presented insufficient evidence to support his conviction on count 3, PDP. "When reviewing a challenge to the sufficiency of the evidence, the test is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). "When the sufficiency of the evidence is challenged in a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). The reviewing court considers the sufficiency of

the evidence in light of the instructions given to the jury. *State v. Jussila*, 197 Wn. App. 908, 921, 392 P.3d 1108 (2017).

Lam argues that by relying on the definition of "drug paraphernalia" from SCC 10.48.010, which is narrower than the definition in RCW 69.50.102, the State "took on a greater burden" and was required to prove that the "primary design function" of tinfoil was for the use of drugs. He explains that the primary design functions of aluminum foil are to store food and for engineering purposes. However, as Lam was charged with PDP under SCC 10.48.020, the definition from SCC 10.48.010 was appropriate. The court provided the definition verbatim in jury instruction no. 16 and neither party objected. SCC 10.48.010 provides a non-exhaustive list of factors to consider in the determination of whether an item is drug paraphernalia, along with examples of items that are clearly not manufactured expressly for drug use, like spoons, mixing bowls, and balloons, which nonetheless may fall within the definition of drug paraphernalia under the county code. Accordingly, Lam's "primary design function" argument is without merit.

As previously established, the State introduced evidence that Lam was found in possession of aluminum foil with burn marks on it that contained a portion of a blue pill. This partial blue M-30 pill found inside the foil in Lam's possession was also in close proximity to a plastic bag containing 112 other blue M-30 pills found on the floorboard where Lam was sitting which were seized and sent to the state crime lab for analysis.[13] Forensic testing later confirmed that the bagged blue M-30 pills seized from the floor of the rear passenger compartment contained

---

[13] *See* SCC 10.48.010 ("In determining whether an object is drug paraphernalia, a court . . . should consider . . . the proximity of the object to controlled substances.").

fentanyl. Other similar rectangular pieces of foil were also found on the floorboard where Lam was sitting. The State established that Lam also possessed a "tooter," which Harris testified is an instrument made from a tubular object such as a broken pen that is used to ingest fumes. Further, Harris specifically explained that the tinfoil with burn marks found in Lam's possession was similar to drug paraphernalia he has seen before while on duty as a law enforcement officer.

When viewed in the light most favorable to the State, we conclude the evidence is sufficient to support Lam's conviction on count 3.

V.      Victim Penalty Assessment

In supplemental briefing, Lam assigned error to the imposition of the victim penalty assessment (VPA) in light of the amended version of RCW 7.68.035. Lam was found indigent at sentencing and, pursuant to recent statutory amendment, courts are no longer authorized to impose the VPA upon indigent defendants. RCW 7.68.035(4). Accordingly, he requests this court strike the VPA from his judgment and sentence. The State agrees that RCW 7.68.035 applies and concedes error as to the imposition of the VPA. The amended version of RCW 7.68.035 applies to cases on direct appeal. *See State v. Ellis*, 27 Wn. App. 2d 1, 17, 530 P.3d 1048 (2023); *see also State v. Wheeler*, No. 83329-4-I, slip op. at 22 (Wash. Ct. App. Aug. 7, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/833294.pdf.[14] We remand for the trial court to strike the VPA from Lam's judgment and sentence.

---

[14] Pursuant to GR 14.1(c), we may cite to unpublished cases as "necessary for a reasoned decision." We adopt the expanded reasoning set out in *Wheeler* as to the application of this statutory amendment to cases on direct appeal.

VI. Statement of Additional Grounds for Review

Lam submitted a statement of additional grounds for review (SAG) in which he raises two issues. First, he states "one charge but they split make it 2." Second, Lam cites *State v. Blake*, 197 Wn.2d 170, 481 P.3d 521 (2021), and asks this court to "squash all [his] old points."

Under RAP 10.10, "the defendant may file a pro se statement of additional grounds for review to identify and discuss those matters related to the decision under review that the defendant believes have not been adequately addressed by the brief filed by the defendant's counsel." RAP 10.10(a). We need not reconsider "alleged errors [that] have been thoroughly addressed by counsel." *State v. Thompson*, 169 Wn. App. 436, 493, 290 P.3d 996 (2012). Further, this court "will not consider a defendant's statement of additional grounds for review if it does not inform the court of the nature and occurrence of alleged errors." RAP 10.10(c). When reviewing the defendant's statement of additional grounds, this court "is not obligated to search the record in support of claims made" therein. *Id.*

Because the precise nature of the first claim set out in Lam's SAG is unclear, we decline to reach it.[15] As to his second additional ground, Lam fails to identify the specific nature of the prior convictions he argues should be excluded under *Blake*, how *Blake* applies to each of those prior convictions, or otherwise explain how his offender score or sentencing range would change as a result of their exclusion. In the absence of any argument to inform this panel of the "nature and occurrence" of any purported *Blake* errors, we decline to reach this claim.

---

[15] In the event that this challenge goes to the denial of his severance motions, that issue has been analyzed herein.

Lam has failed to establish any error that warrants reversal and we affirm his convictions. However, we remand for the trial court to strike the VPA from the judgment and sentence.

Hazel, ACJ

WE CONCUR:

Feldman, J.          Coburn, J.